**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

**CEC CONTROLS COMPANY, INC.**                                    **PLAINTIFF**

**v.**                              **Case No. 4:21-CV-00125-LPR**

**H & H ELECTRIC, INC., and
AUTO-OWNERS INSURANCE COMPANY**                      **DEFENDANTS**

**and**

**UNITED STATES for the Use of**                **THIRD-PARTY PLAINTIFF**
**H & H ELECTRIC, INC.**

**v.**

**HUFFMAN CONSTRUCTION, LLC, and
FIDELITY AND DEPOSIT COMPANY
OF MARYLAND/ZURICH AMERICAN
INSURANCE COMPANY**                **THIRD-PARTY DEFENDANTS**

## ORDER

This case arises from the termination of a public-works contract concerning the construction of a pumping station. The contract was between the United States Army Corps of Engineers and its principal (or general) contractor for the project—Huffman Construction, LLC. As one might expect, the termination of this contract resulted in a bunch of downstream contract terminations. A number of these downstream contract terminations are at issue in the case at bar.

Presently pending before the Court is a fairly limited Motion for Partial Summary Judgment from H & H Electric, Inc.[1] After being sued by its subcontractor, H & H filed a Third-Party Complaint against Huffman and Huffman's surety, Zurich American Insurance Company.[2] The Third-Party Complaint sets out claims against both entities for breach of contract and a

---

[1] H & H's Mot. for Summ. J. (Doc. 43).

[2] The party's full name is Fidelity and Deposit Company of Maryland/Zurich American Insurance Company, but, for ease of reading, the Court will refer to it as Zurich.

violation of the Miller Act.  However, H & H is only asking for summary judgment on its breach-of-contract claims.  Further, H & H is only asking for summary judgment as to the existence and scope of liability, not the calculation of damages.

For the reasons explained below, H & H's Motion for Partial Summary Judgment is GRANTED in part and DENIED in part.  H & H is entitled to summary judgment against Huffman on the breach-of-contract claim.  However, its breach-of-contract claim against Zurich is a non-starter.  In the circumstances of this case, if Zurich has any liability to H & H, that liability would be exclusively under the Miller Act.

## BACKGROUND

We are at the summary-judgment stage.  This Background Section thus relies heavily on undisputed facts.  Where there are genuine disputes of fact, the Court adopts the most pro-defendant version of such facts that a rational juror could accept.[3]  Accordingly, the facts set forth in this Background Section are good for purposes of this Partial Summary Judgment Motion only.

### I.  The Contractual Relationships at Issue in this Case

The Army Corps of Engineers hired Huffman, a Missouri corporation,[4] to be the general construction contractor for the Grand Prairie Pump Station Project ("the Project") in DeValls Bluff, Arkansas.[5]  The Army Corps of Engineers, the owner of the Project, solicited Huffman for construction of "the GPPS Superstructure (Base) and Installation of the final section of Discharge Pipes from pipeline station 13+50 to station 22+00."[6]

---

[3] The Defendants are the nonmovants here.

[4] H & H's Compl. (Doc. 24) ¶ 2; Huffman's Answer to H & H's Compl. (Doc. 29) ¶ 2.

[5] Ex. 1 (The General Contractor Agreement) to H & H's Mot. for Summ. J. (Doc. 43-1).

[6] *Id.* at 1.

The General Contractor Agreement between Huffman and the Army Corps of Engineers recognized that the Corps could terminate that agreement for cause:

> If the contractor refuses or fails to prosecute the work or any separable part, with the diligence that will insure its completion within the time specified in this contract including any extension, or fails to complete work within this time, the Government may, by written notice to the Contractor, terminate the right to proceed with the work (or the separable part of the work) that has been delayed.[7]

The General Contractor Agreement further provided that, in the case of termination, Huffman must immediately "[t]erminate all subcontracts to the extent they relate to the work terminated."[8]

Among other things, that agreement required Huffman to obtain a payment bond.[9]  This requirement is statutorily mandated by the Miller Act, which provides:

> Before any contract of more than $100,000 is awarded for the construction . . . of any . . . public work of the Federal Government, a person must furnish to the Government . . . [a] payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person.[10]

The Supreme Court has explained the purpose of such a payment bond:

> Ordinarily, a supplier of labor or materials on a private construction project can secure a mechanic's lien against the improved property under state law.  But a lien cannot attach to Government property, so suppliers on Government projects are deprived of their usual security interest.  The Miller Act was intended to provide an alternative remedy to protect the rights of these suppliers.[11]

On September 15, 2014, Zurich issued a payment bond to the United States with Huffman as Principal for $25,414,000.[12]  (For purposes of this case, Zurich is what we call a "Miller Act surety.")  The Payment Bond reads as follows:

---

[7] *Id.* at 192–93.

[8] *Id.* at 190.

[9] *Id.* at 1, 22.

[10] 40 U.S.C. § 3131(b).

[11] *F.D. Rich Co., Inc. v. United States ex rel. Indus. Lumber Co., Inc.*, 417 U.S. 116, 122 (1974) (citation omitted).

[12] Ex. 2 (Zurich Bonds) to H & H's Compl. (Doc. 24) at 27–28.

We, the Principal and Surety(ies), are firmly bound to the United States of America . . . in the above penal sum [$25,414,000]. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. . . . The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in [the General Contractor Agreement], and any authorized modifications of the contract that subsequently are made.[13]

On November 20, 2014, Huffman subcontracted with H & H.[14]  Under the agreement, H & H would provide certain electrical work on the Project, and Huffman would pay $3,387,961 for this work.[15]  There are two portions of this Huffman-H & H Agreement that feature heavily in the parties' arguments on the instant Motion.  The Court lays these two portions out in full.  The first portion of the Huffman-H & H Agreement is made up of Sections 8.2 (Progress Payments) and 8.3 (Final Payment):

8.2 PROGRESS PAYMENTS[.]

8.2.1 APPLICATIONS[.] The Subcontractor's applications for payment shall be itemized and supported by substantiating data as required by the Subcontract Documents. If the Subcontractor is obligated to provide design services pursuant to Paragraph 3.8, Subcontractor's applications for payment shall show the Designer's fee and expenses as a separate cost item. The Subcontractor's application shall be notarized if required and if allowed under the Subcontract Documents may include properly authorized Subcontract Construction Change Directives. The Subcontractor's progress payment application for the Subcontract Work performed in the preceding payment period shall be submitted for approval of the Contractor in accordance with the schedule of values if required and Subparagraphs 8.2.2, 8.2.3, and 8.2.4. The Contractor shall incorporate the approved amount of the Subcontractor's progress payment application into the Contractor's payment application to the Owner for the same period and submit it to the Owner in a timely fashion. The Contractor shall immediately notify the Subcontractor of any changes in the amount requested on behalf of the Subcontractor.

8.2.2 RETAINAGE[.] The rate of retainage shall be (as per USAGE requirements) percent (as per USAGE requirements %), which is equal to the

---

[13] *Id.* at 27.

[14] Ex. 2 (Huffman-H & H Agreement) to H & H's Mot. for Summ. J. (Doc. 43-2) at 2.

[15] *Id.* at 2, 13.

percentage retained from the Contractor's payment by the Owner for the Subcontract Work. If the Subcontract Work is satisfactory and the Subcontract Documents provide for reduction of retainage at a specified percentage of completion, the Subcontractor's retainage shall also be reduced when the Subcontract Work has attained the same percentage of completion and the Contractor's retainage for the Subcontract Work has been so reduced by the Owner.

8.2.3 TIME OF APPLICATION[.] The Subcontractor shall submit progress payment applications to the Contractor no later than the fifteenth (15th) day of each payment period for the Subcontract Work performed up to and including the fifteenth (15th) day of the payment period indicating work completed and, to the extent allowed under Subparagraph 8.2.4, materials suitably stored during the preceding payment period.

8.2.4 STORED MATERIALS[.] Unless otherwise provided in the Subcontract Documents, applications for payment may include materials and equipment not yet incorporated in the Subcontract Work but delivered to and suitably stored on-site or off-site including applicable insurance, storage and costs incurred transporting the materials to an off-site storage facility. Approval of payment applications for such stored items on or off the site shall be conditioned upon submission by the Subcontractor of bills of sale and required insurance or such other procedures satisfactory to the Owner and Contractor to establish the Owner's title to such materials and equipment, or otherwise to protect the Owner's and Contractor's interest including transportation to the site.

8.2.5 TIME OF PAYMENT[.] Receipt of payment by the Contractor from the Owner for the Subcontract Work is a condition precedent to payment by the Contractor to the Subcontractor. The Subcontractor hereby acknowledges that it relies on the credit of the Owner, not the Contractor for payment of Subcontract Work. Progress payments received from the Owner for the Subcontractor for satisfactory performance of the Subcontract Work shall be made no later than seven (7) Days after receipt by the Contractor of payment from the Owner for the Subcontract Work.

8.2.6 PAYMENT DELAY[.] If the Contractor has received payment from the Owner and if for any reason not the fault of the Subcontractor, the Subcontractor does not receive a progress payment from the Contractor within seven (7) Days after the date such payment is due, as defined in Subparagraph 8.2.5, or, if the Contractor has failed to pay the Subcontractor within a reasonable time for the Subcontract Work satisfactorily performed, the Subcontractor, upon giving seven (7) Days' written notice to the Contractor, and without prejudice to and in addition to any other legal remedies, may stop work until payment of the full amount owing to the Subcontractor has been received. The Subcontract Amount and Time shall be adjusted by the amount of the Subcontractor's reasonable and verified

cost of shutdown, delay, and startup, which shall be effected by an appropriate Subcontractor Change Order.

8.2.7 PAYMENTS WITHHELD[.] The Contractor may reject a Subcontractor payment application in whole or in part or withhold amounts from a previously approved Subcontractor payment application, as may reasonably be necessary to protect the Contractor from loss or damage for which the Contractor may be liable and without incurring an obligation for late payment interest based upon:

8.2.7.1 the Subcontractor's repeated failure to perform the Subcontract Work as required by this Agreement;

8.2.7.2 loss or damage arising out of or relating to this Agreement and caused by the Subcontractor to the Owner, Contractor or others to whom the Contractor may be liable;

8.2.7.3 the Subcontractor's failure to properly pay for labor, materials, equipment or supplies furnished in connection with the Subcontract Work;

8.2.7.4 rejected, nonconforming or defective Subcontract Work which has not been corrected in a timely fashion;

8.2.7.5 reasonable evidence of delay in performance of the Subcontract Work such that the Work will not be completed within the Subcontract Time, and that the unpaid balance of the Subcontract Amount is not sufficient to offset the liquidated damages or actual damages that may be sustained by the Contractor, as a result of the anticipated delay caused by the Subcontractor;

8.2.7.6 reasonable evidence demonstrating that the unpaid balance of the Subcontract Amount is insufficient to cover the cost to complete the Subcontract Work;

8.2.7.7 third party claims involving the Subcontractor or reasonable evidence demonstrating that third party claims are likely to be filed unless and until the Subcontractor furnishes the Contractor with adequate security in the form of a surety bond, letter of credit or other collateral or commitment which are sufficient to discharge such claims if established. No later than seven (7) Days after receipt of an application for payment, the Contractor shall give written notice to the Subcontractor, at the time of disapproving or nullifying all or part of an application for payment, stating its specific reasons for such disapproval or nullification, and the remedial actions to be taken by the Subcontractor in order to receive payment. When the above reasons for disapproving or nullifying an application for payment are removed, payment will be promptly made for the amount previously withheld.

No later than seven (7) Days after receipt of an application for payment, the Contractor shall give written notice to the Subcontractor, at the time of disapproving or nullifying all or part of an application for payment, stating its specific reasons for such disapproval or nullification, and the remedial actions to be taken by the Subcontractor in order to receive payment. When the above reasons for disapproving or nullifying an application for payment are removed, payment will be promptly made for the amount previously withheld.

8.3 FINAL PAYMENT[.]

8.3.1 APPLICATION[.] Upon acceptance of the Subcontract Work by the Owner and the Contractor and receipt from the Subcontractor of evidence of fulfillment of the Subcontractor's obligations in accordance with the Subcontract Documents and Subparagraph 8.3.2, the Contractor shall incorporate the Subcontractor's application for final payment into the Contractor's next application for payment to the Owner without delay, or notify the Subcontractor if there is a delay and the reasons therefor.

8.3.2 REQUIREMENTS[.] Before the Contractor shall be required to incorporate the Subcontractor's application for final payment into the Contractor's next application for payment, the Subcontractor shall submit to the Contractor:

8.3.2.1 an affidavit that all payrolls, bills for materials and equipment, and other indebtedness connected with the Subcontract Work for which the Owner or its property or the Contractor or the Contractor's surety might in any way be liable, have been paid or otherwise satisfied;

8.3.2.2 consent of surety to final payment, if required;

8.3.2.3 satisfaction of required closeout procedures;

8.3.2.4 other data, if required by the Contractor or Owner, such as receipts, releases, and waivers of liens to the extent and in such form as may be required by the Subcontract Documents;

8.3.2.5 written warranties, equipment manuals, startup and testing required in Paragraph 3.28; and

8.3.2.6 as-built drawings if required by the Subcontract Documents.

8.3.3 TIME OF PAYMENT[.] Receipt of final payment by the Contractor from the Owner for the Subcontract Work is a condition precedent to payment by the Contractor to the Subcontractor. The Subcontractor hereby acknowledges that it relies on the credit of the Owner, not the Contractor for payment of Subcontract Work. Final payment of the balance due of the Subcontract Amount shall be made to the Subcontractor:

.1 upon receipt of the Owner's waiver of all claims related to the Subcontract Work except for unsettled liens, unknown defective work, and non-compliance with the Subcontract Documents or warranties; and

.2 within seven (7) Days after receipt by the Contractor of final payment from the Owner for such Subcontract Work.

8.3.4 FINAL PAYMENT DELAY[.] If the Owner or its designated agent does not issue a certificate for final payment or the Contractor does not receive such payment for any cause which is not the fault of the Subcontractor, the Contractor shall promptly inform the Subcontractor in writing. The Contractor shall also diligently pursue, with the assistance of the Subcontractor, the prompt release by the Owner of the final payment due for the Subcontract Work. At the Subcontractor's request and expense, to the extent agreed upon in writing, the Contractor shall institute reasonable legal remedies to mitigate the damages and pursue payment of the Subcontractor's final payment including interest.

8.3.5 WAIVER OF CLAIMS[.] Final payment shall constitute a waiver of all claims by the Subcontractor relating to the Subcontract Work, but shall in no way relieve the Subcontractor of liability for the obligations assumed under Paragraphs 3.21 and 3.22, or for faulty or defective work or services discovered after final payment, nor relieve the Contractor for claims made in writing by the Subcontractor as required by the Subcontract Documents prior to its application for final payment as unsettled at the time of such payment.[16]

The second portion of the Huffman-H & H Agreement is Section 10.4:

TERMINATION BY OWNER[.] Should the Owner terminate its contract with the Contractor or any part which includes the Subcontract Work, the Contractor shall notify the Subcontractor in writing within three (3) business Days of the termination and upon written notification, this Agreement shall be terminated and the Subcontractor shall immediately stop the Subcontract Work, follow all of Contractor's instructions, and mitigate all costs. In the event of Owner termination, the Contractor's liability to the Subcontractor shall be limited to the extent of the Contractor's recovery on the Subcontractor's behalf under the Subcontract Documents, except as otherwise provided in this Agreement. The Contractor agrees to cooperate with the Subcontractor, at the Subcontractor's expense, in the prosecution of any Subcontractor claim arising out of the Owner termination and to permit the Subcontractor to prosecute the claim, in the name of the Contractor, for the use and benefit of the Subcontractor, or assign the claim to the Subcontractor. In the event Owner terminates Contractor for cause, through no fault of the Subcontractor, Subcontractor shall be entitled to recover from the

---

[16] *Id.* at 15–17.

Contractor its reasonable costs arising from the termination of this Agreement, including overhead and profit on Work not performed.[17]

Whether and how these two portions of the Huffman-H & H Agreement interact with each other is in dispute in this case and in this Motion.

## II.  The Termination of the General Contractor Agreement and the Downstream Effects

The Project was plagued with delays.  The Army Corps of Engineers repeatedly expressed its dissatisfaction with Huffman's work on the Project.[18]  On December 26, 2019, the Corps asked Huffman to "show cause as to whether there were any excusable delays or other pertinent facts and circumstances impacting [its] failure to perform . . . on time."[19]  On March 11, 2020, the Corps sent a letter to Huffman stating that "Huffman Construction, LLC has failed to complete the work within the specified times, failed to diligently prosecute the work, and failed to remedy deficient work."[20]  The letter scheduled a pre-termination meeting to give Huffman a "final opportunity . . . to show cause how the failures to perform are due to unforeseeable causes beyond your control and without fault or negligence on your part."[21]

On March 13, 2020, Huffman responded that the delays were caused entirely by the Government because the Government-furnished pumps were out of level, and the "pump manufacturer ha[d] fully exonerated Huffman from any responsibility . . . ."[22]  On March 18, 2020, Huffman had its pre-termination meeting with the Government.[23]  On March 20, 2020, Huffman

---

[17] *Id.* at 23.

[18] Ex. 6 (Army Corps's March 11, 2020 Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-6) at 1; Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4).

[19] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 1 (referencing a previously sent letter).

[20] Ex. 6 (Army Corps's March 11, 2020 Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-6) at 1.

[21] *Id*.

[22] Ex. 7 (Huffman's March 13, 2020 Letter to Army Corps) to H & H's Mot. for Summ. J. (Doc. 43-7) at 1.

[23] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 2.

sent another letter that (1) asserted that the pump issues were the cause of delay and (2) demanded an extension.[24]  On March 23, 2020, Army Corps personnel visited the site and found that Huffman had "substantially abandoned" the Project.[25]

Finally, on March 31, 2020, the Corps sent Huffman a letter detailing a number of Huffman's shortcomings and terminating the General Contractor Agreement.[26]  (In other words, the contract was terminated "for cause."[27])  Among other things, the letter explained that Huffman was "in default of both the non-pump-and-motor and pump-and-motor related work" and therefore "in default of the entire Contract."[28]  Further, the letter stated that Huffman was unable to substantiate any of its assertions regarding the defective equipment.[29]  In addition to formally terminating the General Contractor Agreement, the letter directed Huffman to "immediately . . . [s]top all work, including work performed by subcontractors and vendors, . . . except for work . . . necessary to . . . [c]orrect existing safety violations[,] [a]void damage to work in place[,] or [p]revent any other undue loss to the Government."[30]  The letter also directed Huffman to immediately "[f]urnish notice of termination to each immediate subcontractor and supplier that

---

[24] Ex. 8 (Huffman's March 20, 2022 Letter to Army Corps) to H & H's Mot. for Summ. J. (Doc. 43-8).

[25] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 1.

[26] *Id.* at 1–5.

[27] Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) ¶ 9.

[28] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 2.  The letter also stated that Huffman's suspension of work was in "direct violation of subparagraph (i) of Contract clause 52.233-1 DISPUTES."  *Id.*  Subparagraph (i) of the Disputes Clause states that "[t]he Contractor shall proceed diligently with performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer."  Ex. 1 (The General Contractor Agreement) to H & H's Mot. for Summ. J. (Doc. 43-1) at 148.

[29] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 2.  None of the correspondence between Huffman and the Army Corps, including the termination letter, mentioned H & H or even hinted that the termination was through any fault of H & H.  Ex. 5 (Huffman's Answers to H & H's Second Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-5) ¶ 11.  And no party suggests such a thing in the litigation at bar.

[30] Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 3.

will be affected by this termination."[31]  Such notice had to include "instructions to stop all work, make no further shipments, place no further orders, and terminate all subcontracts under the contract," and had to "[r]equest that similar notices and instructions be given to its immediate subcontractors."[32]

The termination of the General Contractor Agreement caused a ripple effect down the chain of subcontractors.  Most relevant here, Huffman had to terminate its contract with its subcontractor, H & H.  On April 6, 2020, Huffman sent H & H a termination letter, stating:

> The Corps of Engineers . . . has terminated the . . . project in its entirety.  Stop all work, make no further shipments, place no further orders, and terminate all subcontractors and material suppliers under your contract with Huffman Construction, except for work as necessary to . . . [c]orrect existing safety violations[,] . . . [a]void damage to work in place[,] . . . [or] [p]revent any other undue loss to the Government.  Furnish notice to each immediate subcontractor and material supplier under your contract with Huffman Construction that will be affected by this termination.[33]

There is nothing in the record to suggest that H & H expressly responded to Huffman.  There is nothing to suggest that H & H provided any bills or invoices to Huffman after termination.[34]  There is nothing to suggest that H & H made any type of post-termination demand for payment prior to filing its Third-Party Complaint.

The downstream ripple didn't end with H & H.  In connection with the work H & H had been performing for Huffman, H & H ordered (between 2014 and 2019) a significant amount of goods, materials, and services from CEC Controls Company, Inc.[35]  According to CEC, H & H

---

[31] *Id.*

[32] *Id.*

[33] Ex. 9 (Huffman's Termination Notice to H & H) to H & H's Mot. for Summ. J. (Doc. 43-9).

[34] Huffman admits that it "failed to pay H & H's invoice numbers 10381 and 9995 that H & H submitted to Huffman." Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) ¶ 38. However, nothing in the record tells us whether those invoices were submitted prior to or after termination.

[35] Ex. 1 (Purchase Order and Proposal) to CEC's Compl. (Doc. 4).

never paid CEC for most of that work and those materials even though CEC provided them to H & H.[36]  CEC alleges H & H still owes it $278,904.11 for work and materials related to the Project.[37]  So, CEC initiated the instant lawsuit against H & H.[38]  And this, in turn, led to H & H's Third-Party Complaint against Huffman and Zurich for breach of contract and violation of the Miller Act.  H & H denies that it owes any monies to CEC.  H & H says that, "[b]ecause H & H fully compensated CEC for the work it performed, CEC is not owed any additional money from H & H."[39]  Alternatively, H & H says that, "[i]f, however, it is determined that CEC is owed additional money by H & H, Huffman would be liable to H & H for those amounts because of the delays and setbacks it caused to the Project and because Huffman caused the Project to be terminated early."[40]

H & H's pending Motion for Partial Summary Judgment is limited to the breach-of-contract claims and further limited to the issue and scope of liability.  H & H seeks a partial judgment from this Court that finds, with respect to the breach-of-contract claims, that Huffman and Zurich are "liable to H & H . . . for H & H's reasonable costs, including overhead and profit on work not performed . . . ."[41]  H & H specifically says it is not moving for summary judgment on its Miller Act claims.[42]  H & H also specifically says it is not moving for summary judgment with respect to the calculation of damages.[43]

---

[36] CEC's Compl. (Doc. 4) ¶¶ 5, 6, 8.

[37] *Id.* ¶ 8.

[38] CEC also sued Auto-Owners Insurance Company.  *Id.*  Auto-Owners had issued a bond with H & H as Principal for coverage of H & H's work on the Project.  Ex. 8 (Auto-Owners Bond) to CEC's Compl. (Doc. 4).  As opposed to the bond issued by Zurich, this bond was not a Miller Act bond.  Thus, it was not mandated by federal law and offered no protection to the Government.

[39] H & H's Compl. (Doc. 24) ¶ 19.

[40] *Id.*

[41] H & H's Mot. for Partial Summ. J. (Doc. 43) ¶ 1.

[42] H & H's Reply to Huffman's Resp. to H & H's Mot. for Partial Summ. J. (Doc. 64) at 3.

[43] H & H's Mot. for Partial Summ. J. (Doc. 43) ¶ 1.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[44]  Conversely, if the nonmoving party can present specific facts "showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[45]  The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[46]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[47]  The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[48]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[49]

## DISCUSSION

The analysis of the two breach-of-contract claims at issue in this Motion are strikingly dissimilar.  The Court first addresses the claim against Huffman, and then moves on to the claim against Zurich.

---

[44] Fed. R. Civ. P. 56(a).

[45] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[46] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

[47] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc).

[48] *Celotex Corp.*, 477 U.S. at 322–24.

[49] *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).

## I.  The Breach-of-Contract Claim Against Huffman

H & H argues that Huffman breached the Huffman-H & H Agreement.  This claim arises under Missouri common law.[50]  The elements for breach of contract in Missouri are "(1) a contract, (2) the parties had rights and obligations under the contract, (3) breach, and (4) damages."[51]  The parties do not dispute the first two elements.  And while there is a dispute concerning damages— which the Court resolves later in this Section—that dispute does not really strike at the heart of the damages element.  The principal elements dispute in this case centers on element three: breach.  That is, the parties hotly dispute whether Huffman breached the Huffman-H & H Agreement by terminating it.

### A.  Huffman Committed a Breach by Terminating the Huffman-H & H Agreement

H & H says that Huffman was in breach of their contract the moment Huffman terminated that contract.[52]  Huffman argues that the termination was allowed by, and thus not a violation of, the Huffman-H & H Agreement.[53]  In this vein, Huffman notes that termination was specifically contemplated in Section 10.4 of the Huffman-H & H Agreement.[54]  Huffman's point is that termination alone cannot be a breach.  Instead, according to Huffman, proving a breach of contract in these circumstances requires, at the very least, that H & H establish (1) it had submitted a request for "reasonable costs, including overhead and profit on work not performed," and (2) Huffman

---

[50] The Huffman-H & H Agreement designates Missouri in a choice-of-law provision.  *See* Ex. 2 (Huffman-H & H Agreement) to H & H's Mot. for Summ. J. (Doc. 43-2) at 25.  All parties to this Motion agree that Missouri law applies.  Sept. 12, 2022 Hr'g Tr. (Rough) at 24, 44.

[51] *Roe v. St. Louis Univ.*, 746 F.3d 874, 885–86 (8th Cir. 2014) (citing *Kieffer v. Icaza*, 376 S.W.3d 653, 657 (Mo. 2012) (en banc) (applying Missouri law)).

[52] H & H's Reply to Huffman's Resp. to H & H's Mot. for Partial Summ. J. (Doc. 64) at 8–9; Sept. 12, 2022 Hr'g Tr. (Rough) at 62.

[53] Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 6–7; Sept. 12, 2022 Hr'g Tr. (Rough) at 27–28.

[54] *See* Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 7; Sept. 12, 2022 Hr'g Tr. (Rough) at 27–28.

had rebuffed or ignored the request.[55]  Because (according to Huffman) H & H never submitted such a request to Huffman, Huffman does not believe it had an obligation to pay H & H some "nebulous, undefined, and unsupported sum of money . . . ."[56]  Thus, Huffman argues, Huffman has not failed to perform any obligation under the contract and is not in breach.[57]

H & H has the better of the argument.  As a general matter, Missouri common law hews to the traditional principle that a contract breach occurs when one party to a contract prevents another party to that contract from fully performing that contract.[58]  Huffman admits that H & H's work on the Project was not yet complete, and that the termination prevented further performance by H & H.[59]  The record is clear that the termination of the Huffman-H & H Agreement was the direct result of the General Contractor Agreement being terminated "for cause" by the Corps.  The record is also clear that H & H was not at fault in any way for the termination of either agreement.[60]  The Court has little difficulty concluding that Huffman's prevention of H & H completing the contract falls within the traditional concept of contract breach.

Of course, in a breach-of-contract case, general principles and concepts aren't necessarily controlling.  Rather, it is the joint intention of the parties that must be given effect in interpreting

---

[55] *See* Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 7.

[56] *Id.*

[57] *Id.* at 7–8.

[58] *E.g.*, *Chapman v. Kansas City, C. & S. Ry. Co.*, 48 S.W. 646, 648 (Mo. 1898) ("[W]here a party is engaged in the performance of his contract, and is notified by the other party to proceed no further, the party so notified is fully justified in quitting the work, and suing for damages for breach of contract."); *State ex rel. Fletcher v. Blair*, 352 Mo. 476, 481 (Mo. 1944).

[59] Ex. 5 (Huffman's Answers to H & H's Second Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-5) at ¶ 4; Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) at ¶ 15.

[60] Ex. 5 (Huffman's Answers to H & H's Second Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-5) at ¶¶ 4, 8.

an agreement.[61]   And, as Missouri courts make clear, the best (and often only) evidence of the parties' joint intention is the plain, ordinary meaning of the language used in an agreement.[62]   But this does not make things better for Huffman.  If anything, the language of Section 10.4 confirms that our case falls within the general common law principle just discussed.

It is true that Section 10.4 contemplates early termination of the Huffman-H & H Agreement as a downstream effect of termination of the General Contractor Agreement.  But it is just as true that Section 10.4 contemplates that the termination of the Huffman-H & H Agreement would give rise to "liability" on the part of Huffman.[63]   And, in certain circumstances, Section 10.4 contemplates that termination of the Huffman-H & H Agreement would make H & H "entitled to recover" lost profits (in addition to other reasonable costs) from Huffman.[64]   That certainly sounds like an acknowledgment that early termination gives rise to a breach-of-contract claim. The language of Section 10.4 does not somehow immunize Huffman from a breach-of-contract suit in the event of early termination of the Huffman-H & H Agreement—even where this is a downstream effect of the termination of the General Contractor Agreement.  Instead, as relevant here, Section 10.4 merely explains the extent of breach damages that H & H can recover depending on the circumstances of the termination. [65]

---

[61] *E.g.*, *Chochorowski v. Home Depot U.S.A.*, 404 S.W.3d 220, 226 (Mo. 2013) (en banc) ("[T]he primary rule of contract interpretation is that courts seek to determine the parties' intent and give effect to it.").

[62] *Id.* at 226–27 ("The parties' intent is presumed to be expressed by the plain and ordinary meaning of the language of the contract," and that intent will be gathered from the contract alone "[w]hen the language of [the] contract is clear and unambiguous.").

[63] Ex. 2 (Huffman-H & H Agreement) to H & H's Mot. for Summ. J. (Doc. 43-2) at 23.

[64] *Id.*

[65] *Id.*

Moreover, nothing in the language of Section 10.4 conditions Huffman's "liability" or H & H's "entitle[ment] to recover" on some type of pre-suit demand for payment by H & H.[66]  That suggests the termination alone is the breach.  Huffman attempts to bolster its argument that a request for payment was required by pointing to Sections 8.2 and 8.3 of the Huffman-H & H Agreement, which govern "Progress Payments" and "Final Payment," respectively.[67]  Unlike Section 10.4, which has no specific requirement for an application, these Sections require H & H to submit a pay application to Huffman before Huffman is required to pay.[68]  But these Sections are inapplicable to the situation at bar.  The "Progress Payments" Section only applies to "[w]ork performed in the proceeding payment period . . . ."[69]  How could such a section possibly govern post-termination claims for "profit on [w]ork not performed"?[70]  It couldn't.  As for the "Final Payment" Section, it only applies "[u]pon acceptance of the Subcontract Work by the Owner and Contractor and receipt from the Subcontractor of evidence of fulfillment of the Subcontractor's obligations . . . ."[71]  But, as Huffman concedes, H & H was unable to fulfill its obligations.[72]

At the Motion hearing, Huffman's counsel all but conceded that Sections 8.2 and 8.3 do not, by their terms, apply to terminations under Section 10.4.[73]  Counsel invited the Court to consider the "spirit" of Sections 8.2 and 8.3 in determining whether a similar requirement should

---

[66] *Id.*

[67] Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 7–8.

[68] Ex. 2 (Huffman-H & H Agreement) to H & H's Mot. for Summ. J. (Doc. 43-2) at 15–17.

[69] *Id.* at 15.

[70] *Id.* at 23.

[71] *Id.* at 16.

[72] Ex. 5 (Huffman's Answers to H & H's Second Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-5) ¶ 4; Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) ¶ 15.

[73] The Court noted that termination is different from a progress payment or a final payment, and asked counsel whether that was a problem.  Counsel agreed that "[i]t is something different" but argued that, "materially[,] it's the same thing as a final payment."  Sept. 12, 2022 Hr'g Tr. (Rough) at 29.

be imported to Section 10.4.[74]  The Court declines that invitation.  Huffman's early termination of the Huffman-H & H Agreement constituted a breach of that agreement.  A rebuffed post-termination demand for payment was not necessary.[75]

**B.  Huffman is Liable to H & H for Reasonable Costs Arising from the Termination, Including Overhead and Profit on Work not Performed**

Huffman argues that H & H's recovery under Section 10.4 of the Huffman-H & H Agreement is limited to Huffman's recovery against the Corps.[76]  Under this theory, since Huffman has not recovered anything—at this point—from the Corps, H & H can't recover from Huffman. Huffman's argument can be construed in two different ways.  Neither carries the day.

Huffman could be saying it hasn't committed a breach of contract because it hasn't failed to pay money it actually owes to H & H.  To the extent this is Huffman's argument, it is another version of the argument that the Court already addressed above in Discussion Section I.A.  And it fails for the same reasons as the Court already explained in that Section.  Specifically, the breach occurred the moment Huffman terminated the contract; the payment or non-payment of monies under Section 10.4 is irrelevant to the element of breach.

It is more likely, however, that Huffman is arguing something different.  On this read, the argument is that, even if one assumes Huffman breached the Huffman-H & H Agreement by terminating it early, H & H can only recover monies from Huffman that Huffman recovers from

---

[74] The Court asked Huffman's counsel where, outside of Section 8, Huffman believed the Huffman-H & H Agreement required H & H to submit a detailed payment demand to recover costs associated with termination.  Counsel responded that not requiring H & H to submit such a demand "would be against—I hate to use the word 'spirit' of the contract . . . [but] it is against the obvious intention of the parties."  *Id.* at 32.

[75] Even if a rebuffed post-termination demand for payment was necessary to show a breach of the Huffman-H & H Agreement, that has occurred.  H & H's Third-Party Complaint is sufficient to constitute a demand for payment.  H & H's Compl. (Doc. 24).  And Huffman's Answer, which included a blanket denial of owing money to H & H, is sufficient to constitute a rebuffing of that demand. Huffman's Answer to H & H's Compl. (Doc. 29) at ¶ 37.  Unlike standing, which is judged at the point of the filing of a complaint, the merits of a claim are not forever frozen at the moment of filing.

[76] Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 7–8.

the Corps.  There are at least two problems with this version of Huffman's argument.  The first problem is that the argument concerns the calculation of damages, not liability.  Huffman's point is that, whatever categories of damages H & H might theoretically be entitled to, H & H's recovery must be capped by what Huffman recovers from the Corps.  But H & H has made clear that they are not moving for summary judgment as to a damages calculation.  The second, and more fundamental, problem is that the argument runs headlong into the language of Section 10.4 of the Huffman-H & H Agreement.

As already explained above, Section 10.4 discusses the liability arising from a termination of the Huffman-H & H Agreement due to the Corps's termination of the upstream General Contractor Agreement with Huffman.  Section 10.4 provides that, "[i]n the event of [the Corps's] termination, [Huffman's] liability to [H & H] shall be limited to the extent of [Huffman's] recovery on [H & H's] behalf under the [Huffman-H & H Agreement], except as otherwise provided in this Agreement."[77]  While the first part of the quoted sentence aligns with Huffman's position, the second portion does not.  Indeed, it explicitly indicates that the agreement may make exceptions to this general limitation of liability.  And lo and behold, later in this same paragraph, we find such an exception: "In the event [the Corps] terminates [Huffman] for cause, through no fault of [H & H], [H & H] shall be entitled to recover from [Huffman] its reasonable costs arising from the termination of this Agreement, including overhead and profit on [w]ork not performed."[78]

It is not hard to understand what is going on here.  If the Corps terminates the upstream General Contractor Agreement for its convenience (meaning not "for cause"), then Section 10.4 of the Huffman-H & H Agreement makes sure that Huffman is not ultimately on the hook for

---

[77] Ex. 2 (Huffman-H & H Agreement) to H & H's Mot. for Summ. J. (Doc. 43-2) at 23.

[78] *Id.*

downstream damages that were really caused by the Corps.  If, on the other hand, the Corps terminates the General Contractor Agreement for cause (e.g., Huffman's delays and abandonment), and that cause has nothing to do with H & H, then Section 10.4 of the Huffman-H & H Agreement significantly expands Huffman's potential liability because Huffman (not the Corps or H & H) was the cause of the downstream damages.

Huffman takes a contrary view. Huffman suggests that the language allowing a subcontractor to recover reasonable costs (including overhead and profit on work not performed) is not an exception to the general limitation of liability contained in the same paragraph.  Instead, Huffman posits that the recovery-of-reasonable-costs language simply opens up a new category of damages for H & H to pursue in certain defined circumstances.  But, according to Huffman, this category too is subject to the more general limitation of liability.

Huffman's position would make the recovery-of-reasonable-costs language a mere mirage. The only time that language is triggered is when the Corps terminates Huffman for cause and this termination requires Huffman to terminate its agreement with H & H.  But if Huffman was terminated for cause by the Corps, then presumably Huffman would not be able to recover anything from the Corps.  Certainly, Huffman would not be able to recover anything approaching H & H's profits on work not performed.  If H & H's recovery against Huffman was limited to Huffman's recovery against the Corps, then H & H would get nothing or close to nothing.  It certainly wouldn't ever be able to get profits on work not performed.

At the Motion hearing, Huffman's counsel conceded that this was the logical outcome of Huffman's position.[79]  He sought to characterize this as a "harsh outcome" that nonetheless must

---

[79] Sept. 12, 2022 Hr'g Tr. (Rough) at 39.

be enforced as the arms-length bargain between two sophisticated parties.[80]   The Court does not

see things the same way.   The problem with Huffman's position is not the potentially harsh result

for H & H.   The problem is that (1) the more natural reading of Section 10.4 establishes the

recovery-of-reasonable-costs language as an exception to the same Section's general limitation of

liability, and (2) Huffman's reading would render illusory all or most of the recovery-of-

reasonable-costs language in Section 10.4.   Together, these two points establish quite clearly that

Huffman is promoting the wrong understanding of Section 10.4.[81]

H & H argues that, pursuant to Section 10.4 of the Huffman-H & H Agreement, H & H

should receive "reasonable costs arising from the termination of this Agreement, including

overhead and profit on [w]ork not performed."[82]   H & H argues that this recovery should not be

limited by the recovery that Huffman does or does not get from the Corps.   H & H asserts that this

relief was triggered because, "through no fault of H & H," the General Contractor Agreement

between the Corps and Huffman was terminated "for cause" by the Corps.[83]   H & H is right.

Accordingly, H & H's Motion for Partial Summary Judgment for breach of contract is GRANTED

against Huffman.   Huffman breached its agreement with H & H by terminating it, and Huffman

---

[80] Id.

[81] Huffman also argues that the recovery-of-reasonable-costs provision is not triggered because the Corps was wrong to terminate Huffman for cause.  Huffman's Br. in Opp'n to H & H's Partial Mot. for Summ. J. (Doc. 53) at 8; Ex. 1 (Complaint with Armed Services Board of Contract Appeals) to Huffman's Resp. to H & H's Statement of Facts (Doc. 54-1); Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) ¶ 9.  But the relevant language of Section 10.4—"[i]n the event the [Corps] terminates [Huffman] for cause"—is describing a verifiable historical fact.  Currently, there is no question that Huffman was terminated "for cause." Ex. 3 (Huffman's Answers to H & H's First Requests for Admission) to H & H's Mot. for Summ. J. (Doc. 43-3) ¶ 9.  If Huffman is asking for the Court to review the propriety of the Corps's "for cause" determination, that is a non-starter. There are two avenues for appealing such determinations: either (1) appealing to the agency board of contract appeals, or (2) bringing an action directly in the United States Court of Federal Claims. Ex. 4 (Army Corps's Termination Letter to Huffman) to H & H's Mot. for Summ. J. (Doc. 43-4) at 4.  Neither avenue is in this Court.  As things currently stand, there was a "for cause" determination and no subsequent reversal.

[82] H & H's Mot. for Summ. J. (Doc. 43) ¶ 7.

[83] Id.

owes H & H "reasonable costs arising from the termination of this Agreement, including overhead and profit on [w]ork not performed."[84]   The Court wishes to emphasize, however, that it is not in any way deciding what constitutes "reasonable costs," "overhead," or "profit on [w]ork not performed."   That decision will come at a later stage of this litigation.

## II.  The Breach-of-Contract Claim Against Zurich

H & H has also moved for partial summary judgment against Zurich, Huffman's Miller Act surety.  While the Miller Act provides H & H with a cause of action against Zurich, and H & H has such a claim in its Third-Party Complaint, H & H has only moved for summary judgment against Zurich on its breach-of-contract claim.

The Eighth Circuit has not spoken on whether a subcontractor can bring a standalone breach-of-contract claim against a Miller Act surety.  Outside of the Eighth Circuit, there appears to be a growing consensus among courts that actions brought against a surety *on the payment bond itself* must be litigated under the Miller Act.[85]   H & H has not pointed to a single case where a

---

[84] Given the Court's conclusion here, it has no trouble concluding that H & H has provided evidence that would require a rational juror to conclude Huffman's breach caused at least some damages (e.g., lost profits) to H & H.  Huffman's last pay application on February 12, 2020, shows that H & H still had a balance to finish of $201,545.70.  Ex. 1 (Application and Certificate for Payment) to Zurich's Statement of Facts (Doc. 57-1) at 1.  So, while it was not specifically at issue in the parties' arguments, the Court notes that the fourth element of a breach-of-contract claim under Missouri law (the existence of damages) is met too.

[85] *Miller Equip. Co. v. Colonial Steel & Iron Co.*, 383 F.2d 669, 673 (4th Cir. 1967) (noting that the only liability against the Miller Act surety was under the Miller Act); *Bernard Lumber Co., Inc. v. Lanier-Gervais Corp.*, 560 So.2d 465, 467 (La. Ct. App. 1990) (noting that the Miller Act "is the exclusive remedy available to a supplier against a surety . . . on a Miller Act payment bond"); *Cajun Constructors Co. v. Fleming Constr. Co.*, 951 So.2d 208, 219–20 (La. Ct. App. 2006) (holding that the Miller Act is the only basis for assertion of a claim against a surety on a Miller Act payment bond); *United States ex rel. Varco Pruden Bldgs. v. Reid & Gary Strickland Co.*, 161 F.3d 915, 919 (5th Cir. 1998) ("[R]ecovery on the bond must be under the Miller Act."); *United States ex rel. Metric Elec., Inc. v. Enviroserve, Inc.*, 301 F. Supp. 2d 56, 71–74 (D. Mass. 2003) (state-law claims against a Miller Act surety are preempted by the Miller Act); *Am. Auto. Ins. Co. v. United States ex rel. Luce*, 269 F. 2d 406, 408 (1st Cir. 1959) ("It is obvious that the obligation of a surety on a bond furnished under the Miller Act must be determined by federal law . . . ."); *accord United States ex rel. Cal's A/C and Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 329 (5th Cir. 2000); *Am. Creosote Works, Inc. v. Caltoman Contractors, Inc.*, 160 So.2d 310, 312 (La. Ct. App. 1964); *United States ex rel. Great Wall Constr., Inc. v. Mattie & O'Brien Mech. Contracting Corp., Inc.*, 2001 WL 127663 (D. Me. 2001); *see also K-W Indus., Ltd. v. Nat'l Sur. Corp.*, 855 F.2d 640, 643 (9th Cir. 1988); *U.S. Fidelity & Guar. Co. v. Ernest Const. Co.*, 854 F. Supp. 1545, 1556 (M.D. Fla. 1994) (allowing a breach-of-contract claim by a subcontractor against a Miller Act surety to go to trial, but noting that the claim was "not derivative of the payment bond").

subcontractor was able to bring a standalone breach-of-contract claim against a Miller Act surety.[86] Here, H & H's claims against Zurich are based entirely on the payment bond. H & H is not alleging that Zurich acted in bad faith or otherwise committed some sort of independent tort during its dealings with H & H.[87]  Rather, H & H is merely seeking to enforce the payment bond that Zurich issued to the Government on behalf of Huffman. That enforcement is specifically governed by the Miller Act.

The rationales provided by other courts for not allowing subcontractors to bring state-law claims against Miller Act sureties on the payment bond fall generally into two camps. The first camp merely states that the Miller Act is the exclusive remedy—without further explanation.[88] The second camp argues that the Miller Act preempts state law, and that the Miller Act should be the sole remedy in these cases in order to promote uniformity and to ensure that Miller Act sureties are held to consistent standards nationally.[89]  To be fair, neither of these rationales are completely satisfying. While the Court ultimately comes to the same result that these courts have reached, it takes a slightly different analytical route to get there.

---

[86] At the hearing, the Court asked H & H's counsel what case, if any, supports bringing such a claim. Counsel responded that "support for that would be the Consolidated Electric case from the Eighth Circuit." Sept. 12, 2022 Hr'g Tr. (Rough) at 65.  Counsel was referring to *Consolidated Electrical & Mechanicals, Inc. v. Biggs General Contracting, Inc.*, 167 F.3d 432 (8th Cir. 1999). That case is inapposite because it focuses on a subcontractor's non-Miller Act remedies against a general contractor, not against a surety. *Id.  Biggs* held that the subcontractor needed to plead a breach-of-contract claim in addition to a Miller Act claim if it wanted to recover contract damages. *Id.* at 435. While this suggests that a subcontractor can tack on a breach-of-contract claim to its Miller Act claim against a general contractor, it says nothing about bringing a standalone breach-of-contract claim against a Miller Act surety.

[87] The Ninth Circuit, in *K-W Industries*, allowed a subcontractor to bring a tort claim against a Miller Act surety for bad faith in refusing to pay the subcontractor's claim until after the subcontractor filed suit, but noted that this was not a suit on the bond itself.  855 F.2d at 643.

[88] *E.g.*, *Miller Equip. Co.*, 383 F.2d at 673; *Cal's A/C and Elec.*, 220 F.3d at 329; *Bernard Lumber Co., Inc.*, 560 So. 2d at 467; *Varco Pruden Bldgs.*, 161 F.3d at 919; *Cajun Constructors Co.*, 951 So. 2d at 219–20.

[89] *E.g.*, *Am. Auto. Ins. Co.*, 269 F. 2d at 408; *Enviroserve, Inc.*, 301 F. Supp. 2d at 71–74.

By way of the Miller Act, the United States requires general contractors on federal projects of over $100,000 to furnish a payment bond (through a surety) to the United States.[90]  Also by way of the Miller Act, the United States then grants subcontractors a right of action to sue on its behalf under the required bond.[91]  So, the Miller Act both requires the bond in the first place and gives subcontractors the ability to sue on behalf of the Government to enforce the bond.  That's not surprising.  Because the bond is issued to the Government, the Government would seemingly need to authorize any bond-related action on its behalf.  And while it has authorized actions by a subcontractor, it has only done so within the confines of the Miller Act.[92]  Thus, the Miller Act both creates the bond and provides the stand-in-the-shoes-of-the-Government remedy for enforcing the creature it created.  In these circumstances, there is enough to conclude that the Miller Act remedy is the exclusive way to proceed against a surety on a Miller Act payment bond.

In the case at bar, Zurich has issued a payment bond to the Government on Huffman's behalf under the Miller Act.  Zurich's involvement with these entities is mandated and governed entirely by the Miller Act.  Consequently, H & H's ability to sue on the Government's behalf is limited to the right of action the Government has provided under the Miller Act.  H & H's Motion for Partial Summary Judgment on its breach-of-contract claim against Zurich is DENIED.[93]

---

[90] 40 U.S.C. § 3131.

[91] *Id.* at § 3133.

[92] *Id.*

[93] Even if the Court is wrong—meaning a breach-of-contract claim is theoretically viable against Zurich— any damage remedy exceeding what would be authorized by the Miller Act would be preempted.  *See United States ex rel. Walton Tech., Inc. v. Weststar Eng'g, Inc.*, 290 F.3d 1199, 1206 (9th Cir. 2002) (holding that a Miller Act surety's liability is "coextensive with the contractual liability of the principal only to the extent it is consistent with the rights and obligations created under the Miller Act"); *United States ex rel. T.M.S. Mech. Contractors, Inc. v. Craftsmen*, 942 F.2d 946, 953 (5th Cir. 1991) (citation omitted) ("A claim for profit [against a Miller Act surety] does not involve actual outlay and thus 'falls outside both the letter and the spirit of the [Miller] Act.'"); *Great Wall Constr.*, 2001 WL 127663 at *2 (holding that additional state-law claims could not be brought against Miller Act surety because they would expand the Miller Act remedies).  Because H & H still can proceed on its Miller Act claim against Zurich, there would be no practical harm flowing from the Court's hypothetical error on the breach-of-contract claim.

**CONCLUSION**

H & H's Motion for Partial Summary Judgment on its breach-of-contract claim against Huffman is GRANTED as set forth in Discussion Section I of this Order.  H & H's Motion for Partial Summary Judgment on its breach-of-contract claim against Zurich is DENIED as set forth in Discussion Section II of this Order.

IT IS SO ORDERED this 28th day of September 2022.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE